THIS OPINION IS A
PRECEDENT OF THE
THE TTAB

Oral Hearing:                          Mailed:
April 12, 2006                         February 9, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**


The Wet Seal, Inc.
v.
FD Management, Inc.
_____

Opposition No. 91157022

_____

John M. Cone of Hitchcock Evert LLP for The Wet Seal, Inc.

Joseph R. Dreitler of Frost Brown Todd LLC for FD Management, Inc.

_____

Before Holtzman, Kuhlke and Walsh, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:

On February 5, 2002, applicant, FD Management, Inc., filed an application to register the mark ARDENBEAUTY (in typed or standard character form) based upon an allegation of a bona fide intention to use the mark in commerce for the following goods, as amended:

> Fragrance products for personal use, namely, perfume, cologne, toilet water, scented body lotion and moisturizing cream, body oil, body powder,

scented skin soap; cosmetics and skin care preparations, namely, foundation make-up, face powder, blusher, compacts, eye pencils, lip pencils, lipstick, lip gloss, non-medicated lip balm, mascara, eye make-up, eyeliners, skin moisturizer and skin toner; hair care products, namely, shampoo, hair conditioners, hair gel and hair spray; nail care preparations, namely, nail polish, nail strengtheners, and nail polish remover; shaving cream, shaving gel, after-shave lotion; skin soap; shower gel; deodorant; antiperspirant; potpourri; sachets; suntanning preparations; sun screen and sun block preparations, in Class 3.[1]

On June 30, 2003, The Wet Seal, Inc. (opposer or Wet Seal) filed an opposition to registration of the mark in the application. As grounds for opposition, opposer asserts that since a date prior to the filing date of applicant's intent-to-use application, opposer has used the mark ARDEN B for women's clothing, footwear, purses and bags, hair ornaments and jewelry; and in connection with retail apparel stores featuring women's clothing, footwear, hats and clothing accessories; and that applicant's mark ARDENBEAUTY when used on applicant's goods so resembles opposer's mark ARDEN B for its goods and services as to be likely to cause confusion.

Applicant, in its answer, has denied the salient allegations in the notice of opposition.

---

[1] Application Serial No. 76372550. The application includes a claim of ownership of Registration Nos. 2453605; 2278502; 1914462; 1813342; 1649230; 1579710; 1073947; 0545890; and 0545592, for marks consisting of or comprising ELIZABETH ARDEN for a variety of personal and beauty care products and services.

The record includes the pleadings and the file of the involved application; opposer's testimony (with exhibits) of Laura Nicholas, opposer's vice president of store operations; and applicant's testimony (with exhibits) of Ronald Rolleston, applicant's executive vice president and chief marketing officer; and James Thomas Perry, vice president and associate general counsel of applicant's parent company, Elizabeth Arden, Inc. In addition, opposer filed notices of reliance on February 24, 2005 and June 10, 2005; and applicant filed notices of reliance on March 31, 2005 and April 13, 2005.

Both opposer and applicant filed briefs. An oral hearing was held.

Before addressing the merits of the case, some evidentiary matters require our attention. Applicant has filed a motion to strike opposer's June 10, 2005 notice of reliance consisting of printouts of third-party registrations on the ground that the evidence constitutes improper rebuttal.[2] Opposer states in the notice of reliance that it is relying on this evidence to show a relationship between clothing and cosmetic products. Opposer argues that the evidence constitutes proper rebuttal "as it answers Mr. Rolleston's attempts to deny agreeing to this

---

[2] The Board, on July 18, 2005, issued an order deferring consideration of the motion to strike until final decision.

3

point" (Reply Brief, p. 8), meaning that Mr. Rolleston would not concede, on cross-examination, that the goods are related.

The motion to strike is well taken. This rebuttal evidence was not submitted for the proper purpose of denying, explaining or discrediting applicant's case but instead was clearly an attempt by opposer to strengthen its case-in-chief. See The Ritz Hotel Limited v. Ritz Closet Seat Corp., 17 USPQ2d 1466 (TTAB 1990). The burden is on opposer, in the first instance, to come forward during its own testimony period with proof of the essential elements of its claim, one element of which is the relatedness of the parties' goods. Opposer should not have even assumed that applicant would call its own witness, let alone that the witness, if called, would make an admission favorable to opposer's case.

The motion to strike the notice of reliance filed June 10, 2005 is accordingly granted, and the materials submitted thereunder have not been considered.

Further, we note that opposer has introduced, by its notice of reliance dated February 24, 2005, certain documents which are not appropriate for introduction in that manner as they do not qualify as either printed publications, such as books and periodicals available to the public, or as official records as contemplated by Trademark Rule 2.122(e). These documents are identified in the notice of reliance as exhibits

24-29 and 31-35 and they include annual reports, financial statements, advertising invoices and other advertising documents.[3]  Consequently, these exhibits have not been considered.  Other documents, which are identified in the notice of reliance as exhibits 2 through 23, and exhibit 30, although not otherwise admissible by notice of reliance, are considered of record as they are duplicates of exhibits which were properly introduced during the testimony of Ms. Nicholas.

In addition, we note that applicant raised a number of objections during the deposition of Ms. Nicholas, to her testimony regarding matters which occurred prior to her employment with opposer in 2001, including her testimony regarding opposer's use of the mark prior to that date. However, by failing to preserve the objections by renewing them in its brief, applicant has waived its objections to this evidence.  See TBMP §§707.03(c) and 707.04 (2d ed. rev. 2004), and cases cited therein, including Hard Rock Café International (USA) Inc. v. Elsea, 56 USPQ2d 1504, 1507 n.5 (TTAB 2000) (objection to exhibit raised during deposition but not maintained in brief deemed waived); and Reflange Inc. v. R-Con International, 17 USPQ2d 1125, 1126 n.4 (TTAB 1990) (objections

---

[3] Opposer has attempted to introduce the exhibits in the notice of reliance by the declaration of an officer of opposer who identifies and attests to the authenticity of the attached documents.  However, absent a stipulation by the parties to introduce evidence in this manner, the declaration is not properly of record.  See Trademark Rule 2.123(2)(b).

to testimony and exhibits made during depositions deemed waived where neither party raised any objection to specific evidence in its brief).

Finally, we note that in addition to its pleaded ground of likelihood of confusion, opposer in its brief, pointing to statements made during opposer's cross-examination of Mr. Rolleston, argues the unpleaded claim that the involved application is void ab initio on the ground that applicant did not have a bona fide intention to use the mark in commerce on at least some of the identified goods as of the filing of the application. Applicant did not object to opposer's cross-examination on this subject during the deposition and raised no objection in its brief to opposer's introduction of this evidence on the ground that opposer failed to either originally plead or amend the pleading to assert the new issue. Moreover, applicant has addressed the issue on the merits in its brief. Thus, we find that the issue of applicant's bona fide intent to use the mark was tried by the parties with applicant's implied consent. The pleading is accordingly deemed amended under Fed. R. Civ. P. 15(b) to conform to the evidence and to assert the claim. However, contrary to opposer's contention, an application will not be deemed void for lack of a bona fide

6

intention to use absent proof of fraud,[4] or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them.[5] See, with regard to use-based applications, Grand Canyon West Ranch LLC v. Hualapai Tribe, 78 USPQ2d 1696 (TTAB 2006). Thus, we will decide this issue in terms of whether the items, if any, for which opposer has shown applicant's lack of bona fide intention to use the mark should be deleted from the application.

We turn then to the merits of the case and first, the issue of likelihood of confusion. Briefly, opposer, The Wet Seal, Inc., is a young women's or girls' junior contemporary apparel and accessories company operating a chain of stores under the name WET SEAL. ARDEN B is a division of opposer, and it was developed as an extension of opposer's junior business. Opposer claims that it has been selling clothing and accessories under the ARDEN B mark since 1997 and that it has

---

[4] Fraud occurs when an applicant makes a false, material representation that the applicant knew or should have known was false. See General Car and Truck Leasing Systems, Inc. v. General Rent-A-Car Inc., 17 USPQ2d 1398 (S.D. Fla. 1990). Opposer's counsel stated at the oral hearing that a claim of fraud has been asserted, but we find no such claim in the pleading or in the trial record.

[5] Opposer has cited Caesars World, Inc. v. Milanian, 126 Fed.Appx. 775 C.A.9 (Nev.) (February 01, 2005) in support of its position that the application should be held void. This case was not published in the Federal Reporter and moreover there is nothing in the decision to indicate that the application was held void based on the lack of bona fide intent to use the mark on fewer than all the goods.

operated retail clothing and accessories stores under the ARDEN B mark since 1998.

Applicant, FD Management, Inc., is a wholly-owned subsidiary of Elizabeth Arden, Inc. Although applicant filed the involved application on an intent-to-use basis, the record shows that applicant actually began using the ARDENBEAUTY mark on or about August 2002 on at least some of the products identified in the application, including perfume, body lotion and body wash.

Applicant contends that it has used the ARDENBEAUTY mark prior to any date on which opposer can rely. In particular, applicant is claiming priority based on its predecessors' earlier use and ownership of registrations for ELIZABETH ARDEN and/or their asserted earlier use of ARDEN alone in connection with a variety of beauty care products and services. Applicant also argues that the existence of a prior settlement agreement between the parties "negates any potential likelihood of confusion" between the two marks.[6] Brief, p. 3.

---

[6] The agreement itself was introduced, pursuant to the parties' protective order, as a confidential exhibit to the testimony of Mr. Rolleston. However, the testimony regarding the agreement has not been redacted or made confidential. Further, the agreement was again introduced during the deposition of Mr. Perry with no mention of its confidential nature, and the parties have openly discussed certain provisions of the agreement in their briefs. Thus, the confidentiality of the agreement is waived. The Board will nonetheless exercise discretion in discussing the agreement.

As background for the settlement agreement, prior to this opposition, opposer had filed two applications for ARDEN B. in the stylized form shown below.

One application was for women's clothing and accessories and for retail clothing and accessory store services (Serial No. 75365543, filed September 30, 1997); and the other was for sunglasses, jewelry, handbags, and hair ornaments (Serial No. 75394241, filed November 21, 1997).

Applicant's predecessors, Unopco Sub, Inc. and Conopco, Inc., dba Elizabeth Arden Co., opposed each application (Opposition Nos. 91112906 and 91112592, respectively) on the ground of likelihood of confusion based on their ownership of the mark ELIZABETH ARDEN in connection with a variety of beauty care products and services.

The parties on January 9, 2001 entered into a settlement agreement whereby the opposers in that case consented to Wet Seal's use and registration of ARDEN B,[7] and Wet Seal agreed, in

---

[7] The agreement provides that Wet Seal is entitled to use and register the ARDEN B mark in the script format shown above or, if different than that format, "in a distinctively stylized form which is not the same as, nor likely to cause consumer confusion with, any of the stylized forms by which the Elizabeth Arden Mark is commercially portrayed..."

relevant part, never to use the mark ARDEN B on or in connection with "cosmetics, skin care, hair care or fragrance products...or as the name of spas, salons or stores specializing in the sale of cosmetics, skin care, hair care or body products or services... ."[8]  The oppositions were then dismissed.

Wet Seal subsequently abandoned those two applications in settlement of an opposition by a different party and on March 6, 2002 refiled applications for ARDEN B in the stylized form below.[9]

# ARDEN B

From those applications, Registration No. 2795689 for retail clothing stores issued on December 16, 2003; and Registration

---

[8] We note that there are no provisions in the agreement regarding any rights of applicant in the term ARDEN alone or otherwise apart from ELIZABETH ARDEN.

[9] The agreement contains no provisions which would preclude Wet Seal from asserting its claimed rights in the term ARDEN B for the identified goods and services against applicant.  The agreement does require Wet Seal to "avoid the use of the distinctive trade dress features of the Elizabeth Arden 'red door' spas" including the color red to a certain extent on materials such as clothing labels or store signage, and Wet Seal agreed to discontinue use of the labels displayed on "Exhibit B" attached to the agreement.  The record copy of this exhibit is illegible, but in any event, any question of whether Wet Seal is entitled to use the ARDEN B mark in the form shown above is not an issue in this case.

No. 2879970 for women's clothing, jewelry and handbags issued on August 31, 2004.

### Opposer's standing and claim of priority

To begin with, we note that opposer filed a notice of reliance on TARR and TESS copies of one of the registrations noted above, Registration No. 2795689, for clothing stores. Apart from any issue as to whether these records are sufficient to show that the registration is subsisting and owned by opposer as required by Trademark Rule 2.122(d), opposer did not move to amend the pleading to add an allegation of ownership of such registration.[10] Because applicant was not otherwise given fair notice of opposer's reliance on this registration, and moreover applicant has objected to this evidence in its brief, we have given no consideration to this unpleaded registration.[11]

We turn then to opposer's assertion of common law rights in the ARDEN B mark. In order for a plaintiff to prevail on a claim of likelihood of confusion based on its ownership of

---

[10] The registration issued three months after the filing of the opposition.

[11] It is not, in any event, at all clear from the record that opposer is relying on the registration to establish priority. Opposer does not explain the relevance of the registration in its notice of reliance, and only mentions the registration in passing in its brief, and even then not in the context of a claim of priority.
   Opposer has also submitted by this notice of reliance a copy of a pending application for ARDEN B. SPORT. An application is not evidence of anything except that the application was filed on a certain date, and this application was filed on December 3, 2003, subsequent to the filing date of the opposed application.

common law rights in a mark, the mark must be distinctive, inherently or otherwise, and plaintiff must show priority of use. See Otto Roth & Co. v. Universal Foods Corp., 640 F.2d 1317, 209 USPQ 40 (CCPA 1981). Applicant has not questioned the distinctiveness of ARDEN B; nor are there any other circumstances in the case which would have put opposer on notice of this defense, and we therefore find that the mark is distinctive.[12] See The Chicago Corp. v. North American Chicago Corp., 20 USPQ2d 1715 (TTAB 1991). See also Shalom Children's Wear Inc. v. In-Wear A/S, 26 USPQ2d 1516 (TTAB 1993).

As to priority, the testimony of Ms. Nicholas and the supporting documentation, including labels affixed to the clothing, wrapping for accessories, product catalogues showing ARDEN B items of clothing, sales figures, and other records of use, are sufficient to demonstrate opposer's prior and continuing use of the mark on women's clothing such as tops, bottoms, suits and dresses, as well as accessories such as handbags, belts and hats since 1997, and as a mark for opposer's retail clothing stores featuring women's clothing and accessories since 1999.

---

[12] As discussed later in this decision, the record shows that the term ARDEN is a surname. However, there is no evidence or argument that opposer's mark ARDEN B, as a whole, is, or would be perceived as, primarily merely a surname.

The record shows that opposer changed the font of the ARDEN B mark in mid-2001 from its original script style to the block letter form shown above and without the dot or period after the letter "B." However, we find that these are inconsequential changes in terms of opposer's continuing priority rights in the mark. See Ilco Corp. v. Ideal Security Hardware Corp., 527 F.2d 1221, 188 USPQ 485, 487 (CCPA 1976) ("The law permits a user who changes the *form* of its mark to retain the benefit of its use of the earlier form, without abandonment, if the new and old forms create the same, continuing commercial impression" Italics in original.) There is no change in significance from one form to the other and the difference in appearance is negligible. The two marks are substantially identical. In any event, opposer has demonstrated use of the mark in its modified form since prior to the filing date of the application.

We also find that opposer, by virtue of its common law rights arising from use of the mark ARDEN B on clothing and in connection with retail clothing stores, has established a real interest or standing to challenge the involved application. Contrary to applicant's contention, no more is necessary for standing. See Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 1028, 213 USPQ 185 (CCPA 1982).

## Applicant's claim of priority

An intent-to-use applicant is entitled to rely upon actual use, or use analogous to trademark use, prior to the constructive use date of the intent-to-use application. See Corporate Document Services Inc. v. I.C.E.D. Management Inc., 48 USPQ2d 1477 (TTAB 1998); and Dyneer Corp. v. Automotive Products plc, 37 USPQ2d 1251 (TTAB 1995).

Applicant contends that consumers will associate its ARDENBEAUTY fragrance with "the famous 'Elizabeth Arden' and 'Arden' trademarks." Brief, p. 7. Applicant claims, based on its assertion of 80 years of use and registration, extensive advertising and significant sales, that its ELIZABETH ARDEN and ARDEN marks "[are] famous and entitled to a wide scope of protection." Id. Applicant has introduced status and title copies of eight registrations for ELIZABETH ARDEN, and two advertisements for ELIZABETH ARDEN cosmetics emphasizing the ARDEN portion of the mark. Applicant has also introduced nearly 200 third-party registrations containing the word BEAUTY for personal care products. Based on this evidence applicant argues that the word "beauty" is descriptive of such products and contributes little to the overall commercial impression created by ARDENBEAUTY and that ARDEN is the dominant portion of its ARDENBEAUTY mark.

Applicant appears to be making two separate "tacking" arguments. One, that applicant is entitled to tack on the use of ELIZABETH ARDEN to its present mark ARDENBEAUTY. The second argument relates to applicant's claimed use of ARDEN alone and its attempt to tack use of that mark on to ARDENBEAUTY.

The standard for tacking is very strict and tacking in general is permitted only in "rare instances." See Van Dyne-Crotty, Inc. v. Wear-Guard Corp., 926 F.2d 1156, 17 USPQ2d 1866, 1869 (Fed. Cir. 1991). In order to tack on prior use of one mark on to another, the marks must be legal equivalents. To meet the legal equivalents test, the marks must be indistinguishable from one another or create the same, continuing commercial impression such that the consumer would consider both as the same mark. Van Dyne-Crotty, supra. Thus, a minor difference in the marks, such as an inconsequential modification or modernization of the later mark (in the nature of opposer's modification, for example), would not be a basis for rejecting a tacking claim. See In re Flex-O-Glass, Inc., 194 USPQ 203 (TTAB 1977). That is not what we have here. As to applicant's first argument, applicant has demonstrated use of the mark ELIZABETH ARDEN in connection with cosmetic and fragrance products by virtue of the status and title copies of its registrations for ELIZABETH ARDEN, the earliest of which issued from an application filed on May 6, 1921. See Trademark

15

Rule 2.122(d). However, the evidence that applicant has presented does not establish that ELIZABETH ARDEN is a famous mark. Long use and/or registration of a mark, without evidence of the extent of consumer exposure to or recognition of the mark over the years,[13] is not sufficient to prove fame.[14] More important, the fame of ELIZABETH ARDEN, even if proven, would not be a factor in our determination. Tacking is a question of law. In re Dial-A-Mattress Operating Corp., 240 F.3d 1341, 57 USPQ2d 1807, 1812 (Fed. Cir. 2001). As the Court stated

---

[13] The evidence falls far short in this regard. Mr. Rolleston's testimony on this subject, including his statement that ELIZABETH ARDEN "is one of the more established names in our industry" (Dep., p. 10) is conclusory and unsupported by the record. To the extent that applicant is attempting to rely on evidence of the asserted recognition of ARDENBEAUTY to support its contention that ELIZABETH ARDEN is famous, that argument and evidence fails. First, it is not clear from the record whether the evidence of use and promotion of ARDENBEAUTY also pertains to the mark ELIZABETH ARDEN. Even if it did, however, the evidence is insufficient to establish fame of ARDENBEAUTY, and therefore, by extension, ELIZABETH ARDEN. Among other shortcomings of the evidence, the ARDENBEAUTY mark has only been in use for three years; there is no evidence of any media recognition during that time; no evidence of actual sales of ARDENBEAUTY products, as opposed to gross shipments of those products in units and value; and despite applicant's statement in its brief that the products have been sold in 8500 stores since the introduction of ARDENBEAUTY in 2002, there is no evidence to support that claim. In fact, while ARDEMBEAUTY products at some point apparently had been sold in department stores, Mr. Rolleston was unable to identify any department store where the products were currently being sold and he finally admitted that the ARDENBEAUTY brand "wasn't remarkably successful in department stores." Dep., p. 91.

[14] Applicant also contends that Grupo Gigante SA De CV v. Dallo & Co., 391 F.3d 1088, 73 USPQ2d 1258 (9th Cir. 2004) supports its claim that ELIZABETH ARDEN is famous. However, applicant cannot rely on facts found in other cases to establish fame in this case. Furthermore, the Court's statement alluding to the fame of ELIZABETH ARDEN was dicta, made for the purpose of illustrating a hypothetical. It was not based on a finding of fame.

(citing Van Dyne-Crotty, supra at 1868), "No evidence need be entertained other than the visual or aural appearance of the marks themselves."

Applicant is clearly relying on a likelihood of confusion analysis in support of its tacking claim, essentially arguing that because of the fame of ELIZABETH ARDEN, consumers would associate ARDENBEAUTY with ELIZABETH ARDEN and they would believe the products sold under either mark come from the same company. However, the law is clear that two marks are not necessarily legal equivalents merely because they would be deemed confusingly similar. Van Dyne-Crotty, Inc., supra.

ELIZABETH ARDEN and ARDENBEAUTY are not legally equivalent marks. The two marks, while perhaps confusingly similar, are certainly not indistinguishable. Most significantly, ARDENBEAUTY does not include ELIZABETH and it adds the word BEAUTY. Moreover, the two marks on their face impart different information and create different commercial impressions. ELIZABETH ARDEN identifies a particular individual. ARDENBEAUTY, on the other hand, refers broadly to a type of individual, i.e., an individual possessing a certain quality. Although the word BEAUTY, as applicant has shown, has frequently been adopted as part of registered marks in the field of beauty care products and has little trademark significance on its own, the term nonetheless contributes to

the overall commercial impression of the mark. See, e.g., American Paging, Inc. v. American Mobilphone, Inc., 13 USPQ2d 2036 (TTAB 1989) (finding AMERICAN MOBILPHONE PAGING more informative than and hence legally different from AMERICAN MOBILPHONE notwithstanding that "PAGING" was merely descriptive of the services), aff'd unpub'd, 923 F.2d 869, 17 USPQ2d 1726 (Fed. Cir. 1990). See also O-M Bread Inc. v. United States Olympic Committee, 65 F.2d 933, 36 USPQ2d 1041 (Fed. Cir. 1995) (OLYMPIC KIDS creates a different commercial impression than OLYMPIC, notwithstanding the disclaimer of KIDS and its lack of strong trademark significance).

### Applicant's claimed use of ARDEN

Putting aside for the moment the question of whether ELIZABETH ARDEN and ARDEN are legally equivalent marks, we note at the outset that there is no evidence of actual trademark use of ARDEN alone and insufficient evidence of promotion of ARDEN alone to show analogous use.[15] Applicant introduced, during the testimony of Mr. Rolleston, two archival copies of advertisements for ELIZABETH ARDEN products, one for soap, and the other for skin cream and lotion. In both advertisements,

---

[15] To the extent that applicant is arguing that it is entitled to somehow tack on its use of ELIZABETH ARDEN to ARDEN and therefore its present mark ARDENBEAUTY, without evidence of any use or promotion or other evidence of consumer perception of ARDEN alone, but merely on the basis that it is a shortened version of ELIZABETH ARDEN, applicant's argument is rejected.

the word ARDEN is displayed in large letters across the top of the advertisement and ELIZABETH appears in small print within the letter "D" in ARDEN. The advertisement for skin cream and lotion contains a copyright notice of 1990; and a typed listing of magazines, Town & Country, Vanity Fair, Confetti and American Way, appears below the advertisement. Mr. Rolleston read the names of the magazines into the record and stated that the advertisement "features Vendella who was the spokesmodel at the time [and] was featured" in those magazines. Dep., p. 75. The advertisement for soap bears a copyright notice of 1992. There is no similar listing of magazines on the 1992 advertisement, nor any testimony or other evidence indicating when or where the 1992 ad was published.

To begin with, we note that although opposer argues in its brief that Mr. Rolleston lacked personal knowledge of the advertisements and cross-examined him on that subject during the deposition, opposer never objected to Mr. Rolleston's testimony or the introduction of the advertisements during the deposition. Thus, any objection to this evidence is waived,[16]

---

[16] The basis for opposer's objection is not entirely clear and we construe it as an objection to the sufficiency of the foundation for the advertisements, a defect that may have been curable if timely raised. In any event, notwithstanding that Mr. Rolleston was testifying as to matters which occurred prior to his employment with applicant, we find that Mr. Rolleston adequately established the authenticity of the advertisements as archival records. It is not clear that the typed list of magazines appearing at the bottom of the 1990 advertisement was prepared as part of that original record.

19

and the testimony and advertisements will be considered for whatever probative value they may have. That said, however, the probative value of this evidence is very limited. While we accept that the 1990 advertisement contains a list of magazines, there is nothing on the face of the document to indicate when or even whether the advertisement ever actually appeared in those magazines, and Mr. Rolleston's testimony on this point is vague and unconvincing. Furthermore, the copyright notices on the advertisements, while perhaps evidence of when the ads were created, are not evidence that the ads were ever actually run. Moreover, even if we assume that both advertisements appeared in the listed magazines in 1990 and 1992, we have no evidence as to the extent or frequency of publication and exposure during those years but more important, those ads would have appeared over ten years ago. There is no evidence of any continuing effort to separately promote ARDEN at all since that time. Therefore, even if rights in ARDEN had at one point in time been established, which is hardly clear in this case given the presence of ELIZABETH in the letter D, applicant has not shown that it has maintained or continued to develop rights in the term.

---

Nevertheless, as opposer did not object to the evidence on this basis, we consider the entire document as properly of record.

In any event, ARDENBEAUTY is not the legal equivalent of ARDEN. "Simply because a mark is a portion of an earlier mark, our analysis should not stop there. Instead, our inquiry must focus on both marks *in their entirety* to determine whether each conveys the same commercial impression." Van Dyne-Crotty, supra at 1869, emphasis in original (rejecting the argument that the Board should have considered CLOTHES THAT WORK as simply the abbreviated version of CLOTHES THAT WORK. FOR THE WORK YOU DO). These marks are not indistinguishable and do not create the same commercial impression. Where ARDEN refers generally to any person with that surname, ARDENBEAUTY imparts additional information about that person, one possessing certain qualities or characteristics.

Thus, we find that applicant has failed to establish use of ARDENBEAUTY on cosmetic products prior to the February 5, 2002 filing date of its application and that opposer has established use of its mark on clothing prior to that date.[17]

We turn then to the issue of likelihood of confusion. In making this determination we point out that the fact that opposer does not have priority of use of its mark on cosmetics, and may be contractually barred from using the mark on

---

[17] We also note, in this regard, that there is no issue of fundamental unfairness to applicant in finding in favor of opposer as to priority. Opposer has used and registered the mark ARDEN B on clothing and clothing stores with the express consent of applicant, presumably because applicant believed there would be no likelihood of confusion with its existing ELIZABETH ARDEN marks.

cosmetics, does not, as applicant claims, settle the matter. We must decide whether there is a likelihood of confusion between opposer's mark ARDEN B as used on the goods and services for which opposer does have priority, namely women's clothing and women's clothing stores, and applicant's mark ARDENBEAUTY for the cosmetic products identified in the application.

## LIKELIHOOD OF CONFUSION

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. In re E.I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). In any likelihood of confusion analysis, however, two key considerations are the similarities or dissimilarities between the marks and the similarities or dissimilarities between the goods and/or services. See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). We discuss the relevant factors below.

### Fame or relative strength of opposer's mark

Opposer began using the ARDEN B mark on clothing in 1997. Opposer first sold the clothing through its WET SEAL clothing stores at that time. In November 1999, opposer opened its first ARDEN B store and began selling ARDEN B merchandise

22

exclusively through those stores.  By February 2001, opposer

was operating about 85 stores in 27 states, with stores located

mostly in shopping malls in major cities such as San Francisco,

Chicago, New York, Miami, Washington, DC and Philadelphia.

Substantially all of the merchandise sold in the ARDEN B stores

is ARDEN B merchandise.

Opposer initially promoted the ARDEN B mark through its

WET SEAL catalogs and later through its ARDEN B catalogues

once the ARDEN B stores opened.  Opposer has advertised in

national magazines such as Glamour, InStyle and Cosmopolitan.

The mark is prominently displayed on storefronts and on

clothing labels and packaging for the merchandise.

Opposer has also submitted evidence of sales and

advertising expenditures, although the specific amounts are

confidential.  Ms. Nicholas testified as to the advertising

expenses for 1999.  She also testified as to sales of ARDEN B

merchandise for each year from 1998 through 2000, and it can be

seen that sales increased dramatically from 1998 to 1999 and

rose again from 1999 to 2000.

The evidence is insufficient to persuade us that opposer's

mark is famous.[18]  There is no evidence as to how widely or

---

[18] Applicant's assertion that its own mark ARDENBEAUTY is famous is
not supported by the record, and in any event, the fifth du Pont
factor requires consideration of evidence pertaining to "the fame of
the prior mark," which in this case means opposer's mark.

23

frequently the product catalogues were distributed; and insufficient evidence of the extent or frequency of national exposure of the mark, particularly for the years 2000 and 2001, and no evidence of national advertising from 2003 forward. Further, Ms. Nicholas did not testify as to the advertising expenditures for any years other than 1999, and according to opposer's advertising budget report for 2000, the amount spent on advertising dropped significantly in that year. We only have testimony as to sales figures for a three-year period from 1999-2000. Ms. Nicholas did not testify as to sales for the more recent years 2001 through 2004.[19] The figures for the three-year period that we do have, while perhaps demonstrating that opposer achieved some level of success during those years, do not, however, appear extraordinary on their face and opposer has not provided a meaningful context for those figures such as evidence of opposer's market share for the goods. As stated by the Federal Circuit, "[r]aw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading... . Consequently, some context in which to place raw statistics is reasonable." Bose Corp. v. QSC Audio Prods.,

---

[19] Opposer submitted over 200 pages of charts containing monthly breakdowns of sales by individual store and/or piece of merchandise from September 2000 through December 2003 but did not provide a figure of its total sales for those years.

293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002). See also Fossil Inc. v. Fossil Group, 49 USPQ2d 1451, 1457 (TTAB 1998); and General Mills Inc. v. Health Valley Foods, 24 USPQ2d 1270 (TTAB 1992).

While the evidence is insufficient to demonstrate that opposer's mark is famous, there is, on the other hand, no evidence that the term ARDEN is commonly used in the clothing field or that opposer's mark is otherwise weak or entitled to anything less than a normal scope of protection. In fact, the term ARDEN appears to be unique in the field.

## Similarity of the marks

In determining the similarity or dissimilarity of marks, we must consider the marks in their entireties in terms of sound, appearance, meaning and commercial impression. See du Pont, supra. See also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005).

While marks must be considered in their entireties, it is well settled that "there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties." In re National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

Applicant's mark is ARDENBEAUTY in typed or standard character form.  Opposer's mark is ARDEN B in the stylized form shown below.

# ARDEN B

When we compare the two marks in their entireties, giving appropriate weight to the features thereof, we find that the marks, while obviously not identical, are similar in sound, appearance, meaning and commercial impression, and that the similarities in the marks outweigh their differences.

The marks ARDEN B and ARDENBEAUTY are similar in sound. The identical first word ARDEN is followed in applicant's mark by a word that has the same beginning letter and sound as the "B" following ARDEN in opposer's mark.

As for appearance, although ARDENBEAUTY is presented as a compound term, the mark clearly would be viewed as being comprised of two individual words, and the term ARDEN still makes a visual impact apart from the word BEAUTY.  Further the stylization of ARDEN B is minimal and insufficient to distinguish the two marks.  In any event, because applicant's mark ARDENBEAUTY is presented in typed or standard character form, the wording could reasonably be displayed in the same block letter form as ARDEN B, thereby increasing the visual similarity of the two marks.  See, e.g., Cunningham v. Laser

26

Golf Corp., 222 F.3d 943, 55 USPQ2d 1842, 1847-48 (Fed. Cir. 2000) (typed drawings are not limited to any particular rendition of the mark). See also Phillips Petroleum v. C.J. Webb, 442 F.2d 1376, 170 USPQ 35 (CCPA 1971).

The marks are also similar in meaning and commercial impression. Both marks consist in significant part of the identical term, ARDEN. The only evidence of record regarding the meaning of ARDEN is that of a surname, which would pertain to both marks.[20] While it is unusual for a surname to be followed by a single letter, as in opposer's mark ARDEN B, the ARDEN portion of the mark still makes a surname impression. The name ARDEN is followed in applicant's mark by the word BEAUTY. That word, as applicant recognizes and the third-party registrations submitted by applicant show, has a descriptive or at least a well understood meaning in relation to beauty care products, and is less significant than ARDEN in creating the mark's commercial impression. See In re National Data Corp., supra. Moreover, the ARDEN name is the first word purchasers will see or hear when encountering either mark and it is

---

[20] The surname meaning of ARDEN is derived from applicant's evidence concerning ELIZABETH ARDEN. The fact that ARDEN is a surname does not automatically render the mark weak or entitled to only a narrow scope of protection. Hunt Foods & Indus., Inc. v. Gerson Stewart Corp., 367 F.2d 431, 151 USPQ 350, 352 (CCPA 1966) ("Section 2(d)...does not set forth special rules regarding the registration of marks involving surnames in determining the issue of likelihood of confusion"). Furthermore, as we noted earlier, there is no evidence that ARDEN is commonly used or otherwise weak in the relevant field.

27

therefore more likely to have a greater impact on purchasers and be remembered by them when they encounter the two marks at different times. See Presto Products Inc. v. Nice-Pak Products Inc., 9 USPQ2d 1895 (TTAB 1988). The significance of the letter "B" in the context of ARDEN B is ambiguous. Because its meaning is not readily apparent, purchasers may view ARDEN B as simply an abbreviated version of the full term ARDENBEAUTY or they may assume that ARDEN B and ARDENBEAUTY are slight variations of the same mark.

### Relatedness of the goods and/or services

In our analysis of this factor, we turn first to a comparison of applicant's cosmetic products, which include fragrances, and opposer's retail women's clothing store services.[21] It is settled that the likelihood of confusion may result from the use by different parties of the same or similar marks in connection with goods, on the one hand, and services which deal with or are related to those goods, on the other. See In re Mucky Duck Mustard Co. Inc., 6 USPQ2d 1467 (TTAB 1988) and Steelcase Inc. v. Steelcare Inc., 219 USPQ 433 (TTAB 1983). See also J. Thomas McCarthy, *Trademarks and Unfair*

---

[21] Applicant contends that because opposer did not allege in the notice of opposition that the goods and services offered under ARDEN B are similar or related to those of applicant, opposer has waived that argument. Opposer is not required to specifically plead every factual component of a likelihood of confusion claim. It is sufficient to generally plead the claim as opposer has done in this case.

*Competition* §24:25 (2006) ("[w]here the services consist of retail sales services, likelihood of confusion is found when another mark is used on goods which are commonly sold through such a retail outlet.").

We find that the parties' goods and services are related. Opposer has introduced evidence that women's and junior's contemporary clothing chains such as BCBG, BEBE, ANTHROPOLOGIE, BANANA REPUBLIC, and FOREVER 21, stores which Ms. Nicholas identified as opposer's competitors, sell both clothing and collateral products such as fragrances or other beauty care products. Further, the evidence shows clothing stores sell the collateral products either under the same marks or variations of the store marks. For example, BEBE sells perfume under the mark BEBE and ANTHROPOLOGIE sells lip gloss under the mark ANTHROPOLOGIE; whereas BANANA REPUBLIC sells bath and shower scrub under the mark BANANA W REPUBLIC, BCBG sells scented soap under the mark BCBGirls, and FOREVER 21 sells nail polish under the mark XXI.

We also find that women's clothing and fragrances are closely related, complementary products. It is clear that these products are used together for the same purpose, to enhance physical appeal and create an overall fashion image. Applicant's witness, Mr. Rolleston identified at least three companies, CALVIN KLEIN, CHANEL and BCBG that sell both

clothing and fragrances under their house marks.  Mr. Rolleston also admitted that a relationship "clearly exists" (Dep., p. 80) between brands of women's clothing and fragrances, indicating that it is not uncommon for both clothing and fragrance products to come from the same source, if not under the same marks.

While the evidence is not overwhelming in quantity, it is sufficient to persuade us that women's clothing and fragrances are commercially related goods.[22]

### Customers and cost

The customers for women's clothing and women's clothing stores would be the same or at least overlap with the customers who would purchase applicant's fragrances and other cosmetics. Opposer's target market is young women in their mid-to-late twenties who are looking for clothing that, as described by Ms. Nicholas, is "more hip than classic."  Dep., p. 75.  As there are no restrictions in the classes of purchasers for applicant's cosmetics, the purchasers must be deemed to encompass all the usual purchasers for cosmetics, including the

---

[22] We also note that a number of cases have recognized the interrelationship between clothing and beauty aids such as fragrance products and cosmetics, including Edison Brothers Stores Inc. v. Cosmair Inc., 651 F.Supp. 1547, 2 USPQ2d 1013 (S.D.N.Y. 1987); Helene Curtis Industries Inc. v. Suave Shoe Corp., 13 USPQ2d 1618 (TTAB 1989); Seligman & Latz, Inc. v. Merit Mercantile Corporation, 222 USPQ 720 (TTAB 1984); Clairol Incorporated v. Topaz Hosiery Mills Inc., 161 USPQ 545 (TTAB 1969); and Catalina, Inc. v. Catalina Cosmetics Corporation, 161 USPQ 55 (TTAB 1969).

young women who purchase opposer's clothing and shop in opposer's clothing stores. See J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 1464, 18 USPQ2d 1889 (Fed. Cir. 1991); and CBS Inc. v. Morrow, 708 F.2d 1579, 218 USPQ 198 (Fed. Cir. 1983). In fact, in referring to the "fragrance profile New Elizabeth Arden Scent" for the product that would eventually become the ARDENBEAUTY fragrance, Mr. Rolleston testified that it is "a fragrance for women, women of every age and every style." Dep., p. 26.

The goods involved in this case are relatively inexpensive. Opposer sells its ARDEN B clothing at a "moderate" price point. Dep., p. 74. An ARDEN B product catalogue shows an average price for dresses ranging from about $100 to $150. Applicant's identification is not restricted to any price point or quality and fragrances are certainly available at a low to moderate price range. Mr. Rolleston testified that fragrances can be purchased for $45-$50 in department stores and can be sold for as little as $15 for a small container in mass retailers such as Wal Mart. We note that the .5 oz. bottle of perfume from the specialty clothing store, BANANA REPUBLIC, sells for $12.50.

Given the relatively low cost and the nature of the goods, the parties' clothing and fragrances may be subject to impulse purchase and frequent replacement. It has often been stated

that purchasers of such products are held to a lesser standard of purchasing care and, thus, are more likely to be confused as to the source of the goods. See, e.g., Specialty Brands, Inc., 748 F.2d 669, 223 USPQ 1281 (Fed. Cir. 1984).

**Channels of trade**

The record shows that the parties advertise and promote their goods and services in some of the same magazines, such as Cosmopolitan, Glamour and InStyle magazines. The record also shows that cosmetics and clothing are typically sold together in department stores and mass merchandise stores and that they are also both sold in smaller retail venues such as specialty clothing stores.

However, opposer's ARDEN B clothing is sold exclusively in opposer's own ARDEN B clothing stores, and the ARDEN B stores sell, almost exclusively, opposer's house brand of clothing. Opposer has expressed no intention of expanding the sale of its merchandise to include the stores of others or the brands of merchandise of others. Applicant argues that because opposer's goods are only sold in opposer's stores, and since opposer is prohibited by the parties' agreement from selling cosmetics under the ARDEN B mark, the parties' clothing and cosmetic products in this case will never in fact be sold together.

Applicant's statement is true, but not compelling. First, purchasers are not going to be aware that opposer is prohibited

32

from selling cosmetic products under the ARDEN B mark. Further, where products are closely related, merely because the products in fact would not be sold together would not necessarily prevent consumers, when encountering the products in different outlets, from believing the products come from the same source. See Freedom Savings and Loan Association v. Fidelity Bankers Life Insurance Company, 224 USPQ 300, 304 (TTAB 1984) ("It is not necessary that goods be competitive or be sold together or through the same outlets if they can be shown to be related in some manner that would suggest to persons encountering them, even at different locations, sources, or offices a likelihood of common sponsorship").

The respective products in this case are closely related and the customers for these closely related products are the same. The young women who shop in department stores and who would purchase ARDENBEAUTY fragrances would also shop at opposer's ARDEN B stores and purchase ARDEN B clothing. Also, as discussed earlier, the evidence shows that it is not unusual for a company to use a variation of its house mark when extending its clothing line to fragrances and other cosmetics. Purchasers would be accustomed to seeing these variations of house marks and they are therefore likely to believe that ARDEN B and ARDENBEAUTY identify different but related product lines from the same source.

In addition, the two products may not even be purchased at the same time. Keeping in mind that the parties' clothing and fragrances are relatively inexpensive, and may be subject to purchase on impulse, consumers who had previously purchased opposer's ARDEN B apparel in one of opposer's ARDEN B stores, upon encountering applicant's perfume, under the mark ARDENBEAUTY in a department store, are unlikely to give the matter great thought, but simply assume because of the products' complementary nature, that they come from or are in some way connected with the same company. See Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., supra.

## Market interface

We turn finally to the tenth du Pont factor, "the market interface between applicant and the owner of a prior mark" which includes consideration of "(b) agreement provisions designed to preclude confusion, i.e., limitations on continued use of the marks by each party..." du Pont supra at 567. In addition to its claim of priority based on the parties' settlement agreement, which we have found unpersuasive, applicant also argues that the settlement agreement "negates any potential likelihood of confusion" between the two marks. Brief, p. 3. Applicant has not explained how the agreement "negates" the likelihood of confusion and we do not find that it does. As we noted earlier, the agreement contains no

provisions regarding opposer's rights in the term ARDEN alone or apart from ELIZABETH ARDEN in connection with fragrances and cosmetics; and nothing precluding opposer from using the mark ARDEN B, at least in its present form, or from asserting its rights in this mark for clothing and clothing stores against applicant. In fact, if anything, the agreement implies that there would be a likelihood of confusion between certain "ARDEN" marks for fragrance and cosmetic products on the one hand, and for clothing and clothing store services on the other.[23]

For the reasons stated above, we find that the contemporaneous use by the parties of ARDEN B and ARDENBEAUTY in connection with the respective goods and/or services would be likely to cause confusion.

If applicant should ultimately prevail in any appeal of this decision, we address the question, noted earlier, of whether the application would in any event require restriction.

---

[23] Although applicant does not argue this point, we note that there is no evidence of actual confusion between opposer's and applicant's marks. However, we consider this factor to be neutral. As noted earlier, applicant's mark has been in use for a relatively short period of time and we have insufficient evidence of the nature and extent of applicant's use during the period of contemporaneous use. In any event, evidence of actual confusion is not required in order to establish likelihood of confusion. See Gillette Canada Inc. v. Ranir Corp., 23 USPQ2d 1768 (TTAB 1992).

**LACK OF BONA FIDE INTENT TO USE**

Opposer argues that Mr. Rolleston "testified as to the particular products on which Applicant intended to use" the mark; that the original intention was to use the mark only on the goods listed in Rolleston exhibit 2 ("new fragrance fact sheet" and "SKU"[24] information) and exhibit 31 (total number and value of products shipped "for period through January 2005"), namely fragrance, body lotion, creme cleanser, creme deodorant, deodorant spray, shower gel, posters, shopping bags and scented cards; and that, in particular, applicant had no bona fide intent to use the mark on shampoo or candles.  It is opposer's contention that Mr. Rolleston "clearly admitted" that ARDENBEAUTY was intended for use on fewer than all the goods in the application.

To begin with, candles are not even included in the identification of goods.  Further, opposer has not shown, prima facie, by a preponderance of the evidence that applicant lacked a bona fide intent to use the mark on shampoo or on any of the other items listed in the identification of goods.  The only evidence which pertains to this issue is the testimony by Mr. Rolleston (pp. 84-88):

> Q.  I would like you to look at Rolleston Exhibit 2 and
> also Rolleston Exhibit 31.  First of all with respect to

---

[24] The SKU refers to a number associated with a specific product type.

Exhibit No. 2, you testified that this included a listing of products under various SKUs.

A. Yes, indeed.

Q. And were these the products you intended to sell under the new brand when you were considering launching a new brand?

A. These were the basic stock products that we were considering which is the fundamental line that we put together.

Q. What other products were you intending to sell under the trademark, under the new brand?

A. Everything that's listed here.

Q. Anything else that's not listed there?

A. Yes. Eventually we would put these things together in gift sets, we eventually would make new product types with it. That's all part of what we do.

With regard to shampoos, Mr. Rolleston testified:

Q. Did you have plans at that time say in early 2002 to extend the brand, the new brand, to other products?

A. When you say "to other products"?
...

Q. How about shampoos?

A. We might have considered doing it at some point in time. But at that point I hadn't decided to do a shampoo or not do a shampoo. I mean, it wouldn't preclude me from it because of the nature of formulations. That's a category that I'm familiar with.
...

Q. Did you take any steps to launch ardenbeauty shampoo?

A. No. I had a body wash.

With regard to "color" cosmetic products which, according to

Mr. Rolleston, include lipsticks, eyeshadows and foundations,

Mr. Rolleston testified:

> Q.  What about colors, were you planning to sell ardenbeauty colors?
>
> A.  What I had done were the color stories as I had used my existing inventories to create color pallets to work with Catherine Zeta Jones [applicant's spokesperson for the new ELIZABETH ARDEN product] so that you can recreate our look through existing inventory.
>
> ...
>
> Q.  Did you plan to introduce ardenbeauty colors?
>
> A.  No.  But that wouldn't have precluded me from doing a color story.  I do those all the time. ... But I didn't specifically plan on creating an ardenbeauty color story at the time that I created the fragrance.  No, I did not.

When Mr. Rolleston was asked "How about an ardenbeauty

potpourri?" he stated "We've made potpourris in the past" and

then referred to his answer to a previous question about

candles wherein he responded that he "would have to go back and

ask one of the girls who works for me who does that.  That

could very easily have been considered."

First, opposer never establishes that Mr. Rolleston would

be the sole person in the company responsible for making the

decisions regarding the marketing plans for those products or

the only person to have knowledge about those plans.  In fact,

Mr. Rolleston's testimony shows with regard to at least certain

products, that he clearly was not the only person involved in the decision-making process. In addition, opposer did not ask questions which fully explored applicant's actual intent. Merely because applicant may not have taken steps to actually launch or introduce a particular product does not mean that applicant otherwise had no intention to develop or market the product. Also, many of Mr. Rolleston's responses are ambiguous and opposer did not follow through on them. For example, it is unclear what Mr. Rolleston meant by his statement that applicant planned to "make new product types," or by his statement that he had not decided "to do a shampoo or not do a shampoo." Mr. Rolleston's testimony regarding applicant's plans for the "color stories" is also unclear, as is his testimony as to when or if the color stories were in fact created. On the other hand, it is clear from Mr. Rolleston's testimony that applicant had the capacity to market and/or manufacture shampoos and color products, having produced them in the past under different marks, which would tend to affirmatively rebut any claim by opposer regarding applicant's intent.

Under the circumstances, the evidence falls far short of demonstrating by a preponderance of the evidence that applicant lacked a bona fide intention to use the mark in connection with any of the identified products.

**Decision:** The opposition is dismissed on the ground of lack of bona fide intention to use the mark, and sustained on the ground of likelihood of confusion.